**FILED**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

FEB 12 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

BLADES GROUP, LLC
      *Plaintiff,*

v.

STREET SMART MATERIALS, LLC
and TRENT THATCH
      *Defendants.*

§
§
§
§
§
§
§
§
§
§

Case No.: **DR:25-CV-00046-EG-JAC**

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Blades Group, LLC's ("Blades Group") Application for an Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Application"), ECF 11, filed August 29, 2025. Defendants Street Smart Materials ("Street Smart") and Trent Thatch ("Thatch") filed a responsive briefing on September 18, 2025. On October 7, 2025, the Court held a hearing on the Application, at which time the Court took evidence and witness testimony, and heard arguments by the Parties. Blades Group then filed a Supplemental Memorandum in Support of Application for a Preliminary Injunction on December 19, 2025. Defendants filed a second joint response on January 6, 2026. Blades Group then filed an additional reply on January 8, 2026. Having reviewed the briefings, evidence, and the applicable law, the Court **DENIES** the Application.

### I. BACKGROUND

Blades Group is a Texas business that deals primarily in the sale of pothole patching materials, namely, asphalt. (Pl.'s Appl. at 3; Andrew Blades Decl. ¶ 4, ECF No. 10-1 (hereinafter "Blades Decl.")). Thatch is a former Blades Group employee, selling asphalt products in the Georgia market. (Blades Decl. ¶ 25–35). Thatch worked at Blades Group for approximately two years before resigning to start his own asphalt business, Defendant Street Smart Materials, LLC. (Blades Decl. ¶ 25–35).

1

After Thatch's resignation on April 21, 2025, Andrew Blades, President of Blades Group, "became suspicious that Trent had taken Blades Group trade secrets and other confidential information, specifically lists of [Blades Group] customer contact information." (Blades Decl. ¶¶ 3, 38). Upon investigation, Blades Group learned that Thatch "had been forwarding confidential Blades Group documents . . . from his Company email address" to his personal email address. (Blades Decl. ¶ 40). Now, Blades Group alleges that Thatch and Street Smart "have been and continue to specifically and intentionally contact Blades Group customers using Blades Group's confidential trade secret information, including customer lists and customer personnel contact information." (Pl.'s Appl. at 4). As a result, Blades Group claims that Thatch and Street Smart's "ongoing misappropriation of Blades Group's trade secrets" is damaging its customer goodwill and relationships. (Pl.'s Appl. at 5).

Blades Group filed its Complaint against Thatch and Street Smart on June 8, 2025, alleging (1) Breach of Contract, (2) Business Disparagement and Libel, and (3) Trade Secret Misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* Blades Group then filed the Application on August 29, 2025, alleging that, absent an injunction, it will continue suffering "irreparable injuries as a result of Defendants' continued use of Blades Group confidential and trade secret information."[1]

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy." *Direct Biologics, LLC v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023). Courts "must balance the competing claims of

---

[1] Any violation of the confidentiality provisions of Thatch's employment agreement, if established, are adequately remediable through monetary damages. (*See* Prelim. Inj. Hr'g at 16). Thatch did not agree to a non-compete or non-solicitation provision, and Blades Group does not contend otherwise. Blades Group may not obtain post-employment restrictions through equitable relief that it elected not to secure by contract.

injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

The party seeking an injunction has the burden to establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Direct Biologics*, 63 F.4th at 1020. The applicant must "clearly carr[y] the burden of persuasion"; only then should the court grant the requested relief. *Id.* (citing *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009)). An injunction is not appropriate where monetary damages would be adequate, and an "anticipated injury" can be the basis for injunctive relief only if it is imminent and not speculative. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011); *accord United States v. Texas*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) (citing *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975)).

### III. DISCUSSION

The DTSA prohibits the unlawful misappropriation of trade secrets. *See* 18 U.S.C. §§ 1836(b), 1838. Under the DTSA, a successful misappropriation claim requires the plaintiff to show that "(1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff." *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022) (cleaned up). A "trade secret" includes "all forms and types of information," including business or financial data where (1) the owner took "reasonable measures under the circumstances to keep the information secret," and (2) the information "derives independent economic value from not being generally known to and readily ascertainable by a person who can gain economic value from the information." 18 U.S.C. § 1839(3). The existence of a trade secret

is a question of fact. *CAE Integrated*, 44 F.4th at 262 (citing *Gen. Univ. Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004)).

Blades Group asserts that the purported trade secrets consist of customer lists and pricing information. (Pl. Appl. at 4). The primary documents it cites in support of that assertion are a collection of "sales reports, company quotes, company invoices, and trade show information." (Pl. Appl. at 4; Blades Decl. ¶ 40). Regardless of how Blades Groups labels the information, the Court finds that the materials identified do not qualify as trade secrets to the extent necessary to obtain a preliminary injunction. Therefore, the court need not reach the remaining elements of the misappropriation claim, nor the remaining issues that applicants must establish when seeking a preliminary injunction.[2]

## A. Customer Lists

"A customer list may be a trade secret, but not all customer lists are trade secrets . . . ."[3] *Guy Carpenter & Co., Inc. v. Provenzale,* 334 F.3d 459, 467 (5th Cir. 2003). Three factors control when evaluating whether a customer list is a trade secret: "(1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee acknowledges that the customer list is confidential; and (3) whether the content of the list is readily

---

[2] Even assuming the pricing information constitutes a trade secret, the Court is skeptical as to whether Blades Group could establish actual misappropriation. As discussed at the hearing, Blades Group's pricing model is not complex. (Prelim. Inj. Hr'g at 22). Just as Thatch could plausibly recall the identities of his principal customers, he could certainly remember or acquire the product's price without reference to the allegedly protected sources. Any inference that he instead referenced confidential trade secrets is likely too attenuated to support a finding of misappropriation. *See CAE Integrated*, 44 F.4th at 263 (stating that "[a]ny injunctions placing conditions on 'employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows.'") (quoting 18 U.S.C. § 1836(b)(3)(A)(i)(I)).

[3] Although the *Guy Carpenter* court was analyzing a Texas common-law claim for misappropriation of trade secrets, courts have frequently applied the same general principles to claims under the DTSA. *See CAE Integrated*, 44 F.4th at 262 (applying identical analysis to both DTSA and TUTSA claims without distinguishing between statutes' analytical frameworks); *Thompson Safety LLC v. Jones*, No. 4:24-CV-2483, 2024 WL 4108788, at *2 (S.D. Tex. Sept. 6, 2024) (same).

4

ascertainable." *Id.* at 467; *see Bureau Veritas Commodities & Trade, Inc. v. Nanoo*, Civil Action No. 20-3374, 2021 WL 5232448, at *3 (E.D. La. 2021) (applying these three *Guy Carpenter* factors to assess trade secret allegations under the DTSA).

Blades Group protects its alleged trade secrets by "explicitly requiring [its] employees to protect confidential materials" via contract. (Pl. Appl. at 9; Blades Decl. ¶ 13). Thatch acknowledged the confidential nature of the information by executing the contract. (*See* Blades Decl. Ex. 1, 7 (stating that "Sales Rep agrees to protect all confidential material including prospect data, sales data, and client information belonging to the Company and shall take all reasonable care in making sure that such confidential material is not disbursed to anyone outside the company.")). Such efforts and acknowledgements are sufficient under Fifth Circuit Case law. *See Guy Carpenter,* 334 F.3d at 468 (finding reasonable efforts and acknowledgements of confidentiality where departing employee signed a contract stating the customer list was confidential); *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 900577, at *4 (W.D. Tex. 2016) (first two elements satisfied where employment agreement affirmed confidentiality of broker list); *Bureau Veritas Commodities,* 2021 WL 5232448, at *4 (first two factors satisfied where employees signed confidentiality materials covering the information). Therefore, the first two factors are not meaningfully disputed, and the Court's remaining analysis will focus on the Court's concern that the alleged customer information is readily ascertainable.

In *Zoecon Industries v. American Stockman Tag Co.*, the Fifth Circuit held that a memorandum containing detailed customer transaction data—such as products purchased, purchase dates, quantities, and customer names and addresses—was not readily ascertainable

because it could only be compiled with "considerable expense." 713 F.2d 1174, 1178–80 (5th Cir. 1983).

This case is distinguishable from *Zoecon*. First, Blades Group has not shown that the information at issue is as particularized as the information that was misappropriated in *Zoecon*. Second, although the court found that the information in *Zoecon* could not be compiled without "considerable expense," it also conceded that the customer contact information itself was readily ascertainable through trade journals; the contact information of Blades Group's customers is even more accessible to the public in light of modern online resources. *Id.* at 1179. Even the information that the *Zoecon* court found could not be compiled without significant investment is today far more accessible with the help of digital tools such as public-records portals and government websites. (Prelim. Inj. Hr'g at 20:9–13; 56–57; Ex. 3). Ultimately, unlike in *Zoecon*, the readily ascertainable nature of the information that is the subject of the Application weighs against categorizing it as a trade secret.

By contrast, in *CAE Integrated*, the Fifth Circuit held that customer lists were not trade secrets where the Plaintiff failed to identify any customer identities that were not publicly available or obtainable through proper means, and where the defendant merely knew who he had worked with during his employment. 44 F.4th at 263.

This case is better analogized to *CAE Integrated* because Blades Group has failed to identify any customer data that cannot be obtained through a public-records search or through Thach's own personal knowledge. (*See* Prelim. Inj. Hr'g at 20:9–11 (stating that "[Defendants] could obtain the information legally by going through the rigmarole of submitting public records requests"); Prelim. Inj. Hr'g Ex. 3 (open records request under the Georgia Freedom of Information Act)); Prelim. Inj. Hr'g at 78:1–10 (Thatch could remember the "20 biggest customers that [he]

6

sold to while at Blades Group."). As a result, Thatch could have independently identified the customers. *See CAE Integrated, LLC v. Moov Techs. Inc.*, No. 1:21-CV-377-RP, 2021 WL 6497092 at *4 (W.D. Tex. 2021), *aff'd sub nom.*, 44 F.4th 257 (5th Cir. 2022) (finding it "most consequential" that former employees could have obtained customer identities independent of their history with the company).

Blades Group responds that the customer information contained in the sales reports was "not readily ascertainable" because it "would have taken [Thatch] a very long time, a lot of money, [and] a lot of leg work to get that information on his own." (Prelim. Inj. Hr'g 21:21–23). But the relevant inquiry is not how Thatch obtained the information or how burdensome it might be for a particular person to do so; as one court explained, "[t]he fact that [Defendant] may have learned this information . . . by virtue of his position . . ., or that it might take longer for a member of the general public to discover it does not render non-secret identities and contact information a secret . . . ." *Thoroughbred Ventures, LLC v. Disman*, No. 4:18-CV-00318, 2018 WL 3752852, at *6 (E.D. Tex. Aug. 8, 2018). In other words, the inquiry is one of objectivity. *See CAE Integrated*, 44 F.4th at 263 (finding industry participant information was readily ascertainable due to their public availability in third-party directories, conventions, trade shows, and online searches).

Blades Group further asserts that the customer list is not readily ascertainable because it was costly and time-consuming to compile. (Prelim. Inj. Hr'g at 41; Supp. Memo. at 3). However, "[c]ustomer relationships do not qualify as trade secrets just because a company invests time and money to cultivate those relationships." *BCOWW Holdings, LLC v. Collins*, No. SA-17-CA-00379-FB, 2017 WL 3868184, at *15 (W.D. Tex. Sept. 5, 2017) (citing *Aerosonic Corp. v. Trodyne Corp.*, 402 F.2d 223, 230 (5th Cir. 1968)). Moreover, the record reflects that Blades Group itself purchased lists of potential customers. (Prelim. Inj. Hr'g at 42–43). The ability to obtain

7

customer identities through commercially available lists strongly indicates that the information was publicly obtainable and readily ascertainable.

Neither of Blades Group's arguments persuade the Court. Therefore, because the Court finds that the customer information at issue is readily ascertainable through proper means, Blades Group has not shown a likelihood of success in establishing the information as a trade secret.

## B. Pricing Information

The record reflects that much of Blades Group's pricing information is also obtainable through public records, and Thach already had personal knowledge of the information based on his prior experience in the Georgia market. (Prelim. Inj. Hr'g at 57; Ex. 3). Thus, for the reasons discussed above, the Court finds that the pricing information is readily ascertainable. *See CAE Integrated*, 44 F.4th at 263 (affirming no DTSA misappropriation where alleged trade secrets were traceable to the employee's personal knowledge and publicly available information). Further discussion is merited as the confidentiality of the pricing information and the nature of the information as generated without the technical effort typical of qualifying trade secrets.

### i. Confidentiality

Blades Group contends that its pricing information, particularly its discount pricing and government bids, constitutes a trade secret because it is not publicly available, is typically discussed in "discrete one-on-one communications" with existing or prospective customers, and is submitted in sealed bids for government contracts. (Blades Decl. ¶¶ 21–24).[4] Blades Group further notes that it maintains a password-protected portal and includes confidentiality provisions in its employment agreements that specifically reference pricing information. (Blades Decl. ¶¶ 13–19).

---

[4] The court does not address Blades Group's reliance on sealed government bids because Thatch did not have access to those bids. (Blades Decl. ¶ 23; Prelim. Inj. Hr'g Tr. at 60:13–25).

Those facts establish that Blades Group treated its pricing information as confidential. But confidentiality alone is insufficient to create a trade secret. *See Oracle Elevator Holdco, Inc. v. Exodus Sols., LLC*, No. 4:19-CV-4658, 2021 WL 4077581, at *19 (S.D. Tex. Sept. 8, 2021) (reasoning that "[i]nformation may be confidential while also not rising to the level of a trade secret"). Instead, the alleged trade secret must consist of information that derives *independent economic value* from being secret. 18 U.S.C. § 1839(3)(B) (emphasis added). Moreover, Blades Group does not contend that potential customers were bound by any confidentiality obligation when receiving or discussing the pricing information. (Blades Decl. ¶ 22–23). While disclosure does not destroy trade secret protection if "the owner of that secret obligates the party receiving it not to disclose or use it," Blades Group has not identified such prohibitions. *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598 (S.D. Tex. 2010) (citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123–24 (5th Cir. 1991)); *see Oracle Elevator Holdco*, 2021 WL 4077581, at *18 (weighing against trade-secret protection where the employer failed to mark pricing information as confidential, and did not require potential customers to agree not to disclose them).

### ii. Technical Effort, Specialized Knowledge, and Significant Expense

Trade-secret caselaw generally involves information developed through substantial technical effort, specialized knowledge, or significant expense. *See, e.g., Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195 (5th Cir. 1986) (modifications to industrial zinc furnace and recovery process); *Taco Cabana Int'l*, 932 F.2d at 1124 (architectural plans and kitchen design); *360 Mortg. Grp.*, 2016 WL 900577, at *2, 4 (great difficulty and expense involved in compiling broker rates). And pricing figures do not necessarily fit the bill. *See Oracle Elevator Holdco*, 2021

WL 4077581, at *19 (pricing figures generated with little effort by ordinary salespeople, lacking sophistication and considerable expense, did not rise to the level of trade secrets).

The Court's review of the sealed sales report shows little variation among customers. (Blades Decl. Ex. 8). Defendant's customers all purchased the same product, in the same relative quantities, at nearly identical prices, with only minor differences of approximately one dollar in some instances. (*Id.*). The relative uniformity of the pricing information that Blades Group seeks to protect, though specific to the industry as a whole, demonstrates the lack of substantial time or technical effort employed while generating the pricing information for individual customers. *See Oracle Elevator Holdco*, 2021 WL 4077581, at *19 (trade secret status declined where [Defendant] did "not even assert a trade secret in any algorithm or formula that it used to reach that price").

Accordingly, Blades Group has not met its burden to demonstrate a likelihood of success in establishing its pricing information as a trade secret.

## IV. CONCLUSION

The record shows that the alleged customer lists were readily ascertainable through public sources and commercially available data, and that the pricing information consisted of largely available, invariable information. Thus, Blades Group is not entitled to the extraordinary remedy of preliminary injunctive relief.

**IT IS THEREFORE ORDERED** that Plaintiff Blades Group, LLC's Application for an Order to Show Cause Why a Preliminary Injunction Should Not Issue, ECF 11, is **DENIED**.

SIGNED, this 12th day of February 2026.

ERNEST GONZALEZ
UNITED STATES DISTRICT JUDGE

10